IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT KNOXVILLE

JANUARY 1997 SESSION

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | |
| Appellee, | ) | No. 03C01-9512-CR-00402 |
| | ) | |
| | ) | Knox County |
| v. | ) | |
| | ) | Honorable Mary Beth Leibowitz, Judge |
| | ) | |
| GROVER DONNELL COWART, | ) | (Especially aggravated robbery and attempted |
| | ) | first degree murder) |
| Appellant. | ) | |

For the Appellant:

Randall E. Reagan
602 South Gay Street
Knoxville, TN 37902

For the Appellee:

Charles W. Burson
Attorney General of Tennessee
        and
Darian B. Taylor
Assistant Attorney General of Tennessee
425 Fifth Avenue North
Nashville, TN 37243-0493

Randall E. Nichols
District Attorney General
        and
Gregg Harrison
Assistant District Attorney General
City-County Building
Knoxville, TN 37902

OPINION FILED:_____


ESPECIALLY AGGRAVATED ROBBERY CONVICTION AFFIRMED; ATTEMPTED
FIRST DEGREE MURDER CONVICTION REVERSED; REMANDED

Joseph M. Tipton
Judge

# O P I N I O N

The defendant, Grover Donnell Cowart, appeals as of right from his convictions by a jury in the Knox County Criminal Court for especially aggravated robbery and attempted first degree murder, Class A felonies. The trial court sentenced the defendant as a Range I, standard offender to twenty-five years and twenty years, respectively, in the custody of the Department of Correction. The court ordered the defendant to serve his sentences consecutively. The defendant contends that:

(1) the evidence is insufficient to support his convictions;

(2) the trial court erred by allowing the introduction of a bloody pillowcase, comforter and T-shirt, and the manner in which the exhibits were shown to the jury was unfairly prejudicial;

(3) the trial court erred by allowing the admission of a photograph of the victim's scars;

(4) the trial court erred by refusing to instruct the jury on certain lesser included offenses;

(5) the trial court erred by refusing to instruct the jury on the defense of duress;

(6) the trial court erred by refusing to instruct the jury that the defendant must have the specific intent to commit the crime to be found guilty under a criminal responsibility theory and erred by refusing to instruct the jury on mere presence;

(7) the reasonable doubt instruction violated the defendant's constitutional rights;

(8) the trial court erred by accepting a verdict of especially aggravated robbery when the range of punishment sheet returned by the jury reflected a different verdict;

(9) the trial court improperly sentenced the defendant; and

(10) dual convictions for especially aggravated robbery and attempted first degree murder violate the defendant's due process rights.

We affirm the judgment of conviction relative to the especially aggravated robbery. Because the trial court failed to instruct the jury on the lesser included offense of attempted second degree murder, we reverse the attempted first degree murder

2

conviction and remand the case for a new trial on the charges. We also remand the case because the trial court failed to make adequate findings for the imposition of consecutive sentences.

Kimberly Barnes, the victim, testified that she met the defendant approximately two months before the offenses occurred. She stated that the defendant went to Chicago in August 1992 to get Milton Tucker, a codefendant, bringing him back to Knoxville to live with him. The victim testified that she called the defendant "Jazz" and Tucker "Mario." She stated that she and the defendant had an intimate relationship. She said that the defendant had been to her apartment approximately ten to fifteen times before the offenses occurred but that he had only come to her apartment once uninvited. The victim stated that the defendant had asked to borrow her car, a Honda Prelude, on one occasion, but she had told him no.

The victim testified that she returned from work at approximately 9:00 p.m. on September 24, 1992. She stated that around 11:15 p.m., the defendant came to her apartment unexpectedly while she was talking on the telephone. She said that she locked the door, shut the sliding doors, and closed the curtains after letting the defendant inside the apartment. She testified that the defendant was wearing dress shorts and a long shirt. She stated that after talking to the defendant for a few minutes, the defendant told her he was going to leave. The victim testified that she walked the defendant to the door. She said that the defendant unlocked the door but then told her that he was not going to leave. She stated that the defendant began kissing and hugging her as he moved her to the end of the couch. She testified that they fell to the floor, and when she asked the defendant to let her up in order to turn on the radio or the air conditioner, the defendant persuaded her not to move. She said that the defendant removed her underwear and then helped her to the bedroom where the defendant began kissing her again as she sat on the side of the bed.

3

The victim testified that she then saw Tucker over the defendant's shoulder pointing a gun at her. She stated that Tucker pushed the defendant out of the way, and the defendant told Tucker, "Man, we don't have any money." She said that Tucker pushed her back and tied her hands and feet with tape. She testified that during this time, the defendant was lying on the side of the bed saying a prayer. The victim said that Tucker rolled her over on her stomach and tried to place tape over her eyes and mouth, but the tape would not stick. She testified that she did not see the defendant again after this point. She stated that a man then tried unsuccessfully to insert his penis inside her vagina. She testified that she was then rolled over, a pillow was placed over her head, and she was penetrated vaginally. The victim testified that she did not see who put the pillow over her face or who raped her.

The victim testified that after being raped, she heard a noise outside the bedroom and the defendant state again, "Man, I told you we don't have any money." She said that she then heard the refrigerator door open and Tucker ask her whether she had anything to drink. She stated that she told Tucker no and then heard someone rummaging through her silverware. She testified that Tucker asked her where her purse was located, and she told him that it was on the dresser. The victim stated that she then heard someone going through her purse and Tucker ask her whether she "liked it." She said that she told Tucker that she enjoyed it because she feared being raped a second time. She said that she did not respond when Tucker asked her why she had cried. The victim testified that when she asked that the ties be loosened, someone lifted her head, placed a white towel around her neck, and then cut her neck and stabbed the left and right side of her neck. The victim did not see who cut her neck.

4

The victim testified that she heard Tucker say something about the telephone and then heard the sound of the cord being cut. She said that after a few minutes she felt someone poke her feet with a very sharp object. She stated that Tucker then told her that he knew everything she did and threatened to blow her brains out if she went outside the apartment. The victim said that after a few more minutes, she heard a car engine start. The victim testified that she was able to get out of the bed and walk to a neighbor's apartment. She said that she had to knock at two nearby apartments before anyone answered. The victim was taken to the hospital and was not released until October 15, 1992. She said that her injuries required two surgeries.

The victim identified a bloody T-shirt as the one she was wearing on the night of the offenses. She also identified a bloody comforter and a bloody pillowcase that had tape on it as the ones involved in the crimes. She identified several photographs. One photograph shows the scars on the victim's neck where it had been cut and stabbed. Another photograph shows the victim's car keys and purse lying in the front seat of her car. A roll of duct tape is shown in the floorboard of the car in another photograph. The victim testified that she did not leave her keys, purse or a roll of duct tape in her car and that she had locked her car when she returned from work.

On cross-examination, the victim testified that she did not feel or see a gun on the defendant. She acknowledged that she earlier said that Tucker placed the pillow over her head and that she saw the defendant on the other side of the bed on the floor at that time. She also acknowledged that she had given a statement to police that Tucker was the one who had raped her.

James Burns, the victim's neighbor, testified that he heard a knock on his apartment door on September 24, 1992. He said that he looked outside and saw that the victim's door was open and was covered in blood. He stated that he also saw blood

in the victim's apartment. Mr. Burns testified that he then saw the victim on the floor above with her hand over her throat asking for help. He stated that the victim was pale and had lost a lot of blood. He said that the victim had duct tape around her wrists and ankles. He stated that he took the victim to his apartment. He said that the victim became unconscious before he placed her on the couch and called 9-1-1 and that afterwards, she came in and out of consciousness. Mr. Burns stated that he later asked the victim what had happened, and the victim repeatedly said, "I can't believe he did it." He said that when he asked her who, the victim replied, "Jazz" and then said, "They knew each other." Mr. Burns testified that he noticed that the victim's car was gone. He said that he gave a description of the car to the officers, and the victim provided the tag number.

Officer Sherri Uzzle of the Knoxville Police Department testified that she lived at Papermill Square Apartments, an apartment complex approximately two hundred feet from the victim's apartment. She said that she was off duty on the night of the offenses but that she was carrying her badge, a gun and a radio. She stated that she became suspicious when she saw a man walking down the street with a paper bag and decided to follow the man. Officer Uzzle testified that she saw the defendant, whom she had not seen before, as she walked to Carlton Square Apartments, an apartment complex near the victim's apartment. She stated that she then drove her vehicle to the apartment complex. She said that she saw the defendant near a light grey Subaru and asked him a couple of questions about the man carrying the paper bag. Officer Uzzle stated that she also saw another black man, whom she later discovered was Tucker, carrying clothes and boxes from an apartment to another car. She said that she then returned to her apartment. She testified that approximately five or ten minutes later and after midnight, the defendant drove the grey Subaru to her apartment complex, parked and then ran toward Carlton Square Apartments. She testified that the car was packed with clothes and boxes. Officer Uzzle testified that she

6

called for a check of the license number on the grey Subaru and that she was later called regarding the vehicle. She said that she went to the police department and while there, she saw Tucker, the person she saw loading the clothes into the car, talking to Detective Hyde.

Officer Kenneth Slagle of the Knoxville Police Department testified that he was parked in an unmarked police car approximately a mile and a half from the victim's apartment when he received a call regarding the crimes. He stated that the call reported that a Honda Prelude had been stolen. He said that as he turned to go to the victim's apartment complex, he saw a Honda Prelude parked along the street with its lights turned off and sitting beside another car that looked like a silver Saab. Officer Slagle said that the occupants were talking to each other. He stated that the driver of the silver car made a U-turn behind the Honda and drove away. Officer Slagle testified that after he confirmed that the license number of the Honda matched the victim's car, he followed and stopped the Honda. Officer Slagle identified a photograph of the victim's car as the one he stopped.

Officer Slagle testified that when the Honda was stopped, Tucker, the driver, jumped out of the car and ran toward the police car. He stated that he pointed his gun at Tucker and told him to place his hands on the Honda, and Tucker complied. Officer Slagle said that he saw a gun, a purse, car keys, and tape in the front seat of the Honda.

Detective Mike Hyde of the Knoxville Police Department testified that he later saw Tucker at approximately 2:30 or 2:45 a.m. at the police station. Tucker was wearing jogging pants and a T-shirt. Detective Hyde testified that during a brief interview at the emergency room, the victim told him that she had been raped, robbed

7

and cut by a black man whom she did not know but that the defendant was involved. He described the victim as being near death when she gave the statement.

Dr. Blaine Enderson, a surgeon at the University of Tennessee Medical Center testified that the victim suffered a slash wound across her entire neck. He said that muscles in the victim's neck had been cut and that her trachea had been injured. He stated that the victim also suffered several stab wounds around her right collarbone, one of which bled severely because a major vein had been injured. He said that the victim had lost a significant amount of blood. Dr. Enderson testified that the victim's injuries required surgery lasting approximately four to five hours. He said that two to three wounds other than the slash wound to the neck required immediate attention. He stated that the victim was hospitalized for approximately sixteen days. Dr. Enderson testified that had surgery not been performed, the victim would have been in grave danger of dying as a result of either difficulty in breathing or loss of blood. On cross-examination, Dr. Enderson testified that he did not observe any bruising. He said that he also did not observe any signs of forced penetration and that no sperm was found inside the victim's vagina.

Xavier Castro, a Chicago, Illinois police officer, testified that he served fugitive warrants on the defendant relative to the crimes involved in this case. He said that he and two other officers went to the defendant's mother's apartment at approximately 10:00 a.m. on September 25, 1992. He stated that a grey Subaru with a Tennessee license plate was parked across the street. Officer Castro testified that when the officers walked into the apartment and announced who they were, the defendant ran into the pantry next to the kitchen and closed the door. He said that the defendant's brother became agitated, requiring that he be restrained. He stated that he ordered the defendant to come out of the pantry, and the defendant complied, telling his brother to calm down because the officers were there for the defendant, not him.

8

Officer Castro testified that the defendant's brother repeatedly asked what was going on and what had the defendant done. He stated that as the defendant was being handcuffed, the defendant replied, "I killed her. I killed her."

Officer Castro testified that as they were driving the defendant to the police station, the defendant asked them, "Is she alive?" He stated that the defendant also asked several times about the condition of a girl in Knoxville, stating that he knew that she had been cut and that he believed that she was dead. He said that the defendant told him that he knew that Tucker had told the officers how to find him. Officer Castro testified that the defendant told him that he and Tucker were from Chicago and that they needed cash and a vehicle to return to Chicago. He stated that the defendant said that he and Tucker planned to take the victim's car and money by the defendant gaining entry to the apartment given the fact that the victim trusted him. The defendant stated that Tucker would then enter the apartment and act like a robber while the defendant persuaded the victim not to resist. Officer Castro testified that the defendant told them that Tucker became violent once he entered the apartment. The defendant said that Tucker bound the victim, raped her, cut her throat, and then fled. The defendant told the officers that he and Tucker argued over who was going to drive the victim's car. Officer Castro stated that the defendant told them that Tucker drove the victim's car, following the defendant out of the apartment complex. The defendant said that he saw the officers stop and arrest Tucker.

Officer Castro testified that the defendant was interviewed at the police station. He said that the defendant asked about the victim's condition and that the officers told the defendant that the victim must be alive because the warrant was not for a homicide. He stated that the defendant became alarmed and told the officers that he wanted to tell them what really happened. Officer Castro testified that the defendant then gave a statement different from that given in the police car. The defendant told

9

the officers that he and Tucker agreed that the defendant should act like a victim but allow Tucker access to the apartment by leaving a window or door unlocked. The defendant said that Tucker restrained the victim by tying her with duct tape. The defendant said that Tucker then began attacking the victim. Officer Castro testified that the defendant told the officers that he "got into the violence of the act." The defendant then admitted that he raped the victim and cut her throat. On cross-examination, Officer Castro admitted that he wrote in his report that the defendant denied any knowledge of how the victim was cut.

The defendant testified that he was from Chicago, Illinois. He said that approximately two weeks after meeting the victim, he borrowed a friend's car and drove to Chicago to bring Tucker to Knoxville to stay with him. He stated that Tucker decided to return to Chicago and asked the defendant to take him home. The defendant testified that Tucker became frustrated when the defendant told Tucker that he did not believe that his friend's car would survive the return trip and that another friend would not let him borrow her car. He stated that he later told Tucker that he was going to see the victim, and Tucker asked him to borrow her car. The defendant said that he told Tucker that he did not know the victim well enough. He said that Tucker then asked the defendant to take the victim's keys, stating that he would return the car. The defendant testified that he refused and told Tucker that it was a crazy idea. He said he initially believed that Tucker was joking, but Tucker told him he was serious as he was leaving. The defendant testified that Tucker then asked him to leave the door open in order for Tucker to be able to come inside the apartment and get the victim's car keys while the defendant was in the bedroom with the victim. He said that Tucker told him that they could drive the victim's car to Chicago and then leave it parked alongside the road. The defendant said that he agreed to the plan, telling Tucker to give him approximately thirty minutes and that he would leave the car keys on the living room table.

10

The defendant testified that he then went to the victim's apartment. He said that the victim was on the telephone when he arrived and that she shut the curtains and the sliding door. He said that at some point, he told the victim he was going to leave and unlocked the door. He stated that he then began kissing the victim, and they fell to the floor. He said that the victim started to turn on some music, but he persuaded her to go into the bedroom instead. The defendant stated that as they were kissing in the bedroom, the victim screamed. He said that he turned around and saw a person wearing a light-colored mask similar to a handkerchief and carrying a gun. He said that he could vaguely see the person's eyes and forehead because it was dark. The defendant testified that the person pushed him to the floor, straddled the victim, put the gun to the victim's head, and ordered the defendant to get on the bed. He stated that he told the person that they did not have any money, and he then panicked and began to pray because he was afraid for his life. The defendant said that when the person told him to be quiet and not to look at him, he put his head into a pillow. He testified that the victim was crying as the person taped her hands over her head. He said that the person told him again not to look at him.

The defendant testified that the person then taped his hands and ankles, placed tape over his mouth, and pushed him to the floor. He said that he lay on the floor for approximately one minute before the person pulled him into the hallway. He stated that the person then went back into the bedroom. The defendant said that he heard the unzipping of pants and the victim moaning and asking to be untied. He testified that he heard the person tell the victim to be quiet. He stated that approximately ten to twelve minutes later, the person got up and asked the victim if she liked it, and the victim replied yes. The defendant testified that the person walked into the kitchen, opened the refrigerator, and asked if she had any soda. He stated that the person also rummaged through silverware. He said that the person pulled the mask down to repeat the question, and at this point, the defendant recognized the person as

11

Tucker. The defendant testified that Tucker asked the victim why she was crying, but she did not respond. Tucker then asked the victim whether she had any money, and the victim told Tucker where her purse was located.

The defendant testified that Tucker then left the bedroom, went into the kitchen, and then bent down beside him, pulled the mask down, and told the defendant, "Don't worry about it. Just shut up." He said that Tucker went back into the bedroom, and he heard the victim sigh loudly. He stated that Tucker then cut the tape off his hands and ankles and told him, "Let's go." The defendant testified that when he asked Tucker what he was doing, Tucker told him to be quiet and that he had the victim's car keys. He said that when he told Tucker that the victim would think that he had something to do with it, Tucker told him to be quiet again. He stated that he replied that he could not do it, and Tucker pointed the gun at him, pulled the chamber, and told him, "I said, let's go." The defendant said that as he started to walk out, Tucker went back into the bedroom and said something to the victim.

The defendant testified that once outside, Tucker told him that he should not try to run away. He said that Tucker gave him the victim's car keys and told him to go to their apartment to get Tucker's clothes. The defendant testified that he had borrowed a friend's grey Subaru and that it was parked at his apartment. He stated that when they arrived at the apartment, Tucker got out of the car immediately and went inside the apartment. The defendant testified that as he was walking toward the apartment, he saw Officer Uzzle who asked him some questions. He said that Tucker was carrying things to the victim's car as he was talking to Officer Uzzle. The defendant stated that he then went inside the apartment, asked Tucker what he was doing, told him that he was not going to Chicago, and told him that his plan was not going to work. He said that Tucker responded that he would drive himself and then asked the defendant to lead him to the interstate. The defendant testified that he agreed so that

12

he could get away from Tucker, and he then drove the grey Subaru and Tucker followed as he led him to the interstate. The defendant admitted that he did not drive toward the interstate but claimed that he was panicked. He also conceded that Officer Slagle was correct that he was talking to Tucker as they were parked alongside the road. He stated that Tucker was then stopped and arrested by the police. The defendant said that he then drove toward the victim's apartment but panicked when he saw several police officers. He stated that instead, he picked up a friend, and they went to Chicago to the defendant's mother's residence. He said that he told his friend that Tucker had raped the victim.

The defendant acknowledged that he ran into a pantry when the police arrived at his mother's apartment in Chicago to arrest him. The defendant denied that he raped or cut the victim, and he denied telling the officers that he had killed or raped the victim. He said that he told the officers that Tucker had raped the victim, not him. He stated that he also told the officers that he did not know anything about the victim being cut. He testified that he asked the officer whether the victim was dead because the officer had told him that her throat had been cut. He denied asking, "Is she alive? Is she alive?" The defendant identified a piece of duct tape that was found lying in the floor of the victim's apartment as the duct tape Tucker used to tape his hands together. He claimed that he did not know that Tucker was going to harm the victim. He stated that he intended only to leave the door open so that Tucker could get the victim's car keys. He believed that Tucker was going to leave while he and the victim were in the bedroom.

On cross-examination, the defendant testified that he and Tucker had been friends since childhood. He said that he and Tucker were unemployed at the time of the offenses. He stated that he had not seen Tucker with a gun or mask during the time that he was staying with him. The defendant said that Tucker took duct tape from

13

the grey Subaru. He admitted that he knew that Tucker was going to come into the victim's apartment and take the victim's car keys. He conceded that he could recognize Tucker's voice under normal circumstances, but he stated that the mask over Tucker's face muffled his voice, making it impossible to know that the intruder was Tucker. He said that he also did not recognize Tucker's height and build. The defendant conceded that he did not check on the victim before leaving but claimed that he did not know that she had been cut. The defendant denied that either he or Tucker put anything in the grey Subaru and asserted that Officer Uzzle was mistaken.

The defendant and Tucker were charged with especially aggravated robbery, attempted first degree murder, and aggravated rape.[1] The jury found the defendant guilty of especially aggravated robbery and attempted first degree murder but not guilty of the rape charges.[2]

## I. SUFFICIENCY OF THE EVIDENCE

The defendant contends that the evidence is insufficient to prove beyond a reasonable doubt that the defendant committed especially aggravated robbery or attempted first degree murder or that the defendant was criminally responsible for the acts committed by Tucker. Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). This means that we do not reweigh the evidence, but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield,

---

[1]The record reflects that Tucker entered guilty pleas to the offenses of especially aggravated robbery and attempted second degree murder.

[2]This case involves the second trial of the defendant for the charges. The first trial ended in a mistrial.

676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

For circumstantial evidence to constitute the sole basis for a conviction, the facts must be "so closely interwoven and connected that the finger of guilt is pointed unerringly at the defendant and the defendant alone." State v. Crawford, 225 Tenn. 478, 484, 470 S.W.2d 610, 613 (1971). The evidence must be both consistent with the defendant's guilt and inconsistent with the defendant's innocence, exclude all other reasonable theories except that of guilt, and establish the defendant's guilt so as to convince the mind beyond a reasonable doubt that he or she committed the crime. Patterson v. State, 4 Tenn. Crim. App. 657, 661, 475 S.W.2d 201, 203 (1971).

Especially aggravated robbery is a robbery accomplished with a deadly weapon where the victim suffers serious bodily injury. T.C.A. § 39-13-403(a)(1) and (2). Robbery is defined as the intentional or knowing theft of property from the person of another by violence or putting the person in fear. T.C.A. § 39-14-401(a).

The defendant is guilty of attempted first degree murder if the proof shows that he attempted, as defined by T.C.A. § 39-12-101(a), to commit an unlawful, intentional, premeditated and deliberate killing of another. See T.C.A. §§ 39-13-201(a) and -202(a)(1) (1991)[3]. Our criminal code defined a deliberate act as "one performed with a cool purpose," and a premeditated act as "one done after the exercise of reflection and judgment." T.C.A. § 39-13-201(b)(1) and (2) (1991). In State v. Brown, 836 S.W.2d 530 (Tenn. 1992), our supreme court further defined deliberation as requiring some period of reflection, without passion or provocation, and concluded that the "deliberation necessary to establish first degree murder cannot be formed in an

---

[3]Pursuant to an amendment effective July 1, 1995, the statutory provision defining first degree murder was amended, purportedly deleting the requirement of deliberation. See T.C.A. § 39-13-202(a)(1) (Supp. 1996).

15

instant." Id. at 539, 543. Premeditation requires a showing of a previously formed design or intent to kill. State v. West, 844 S.W.2d 144, 147 (Tenn. 1992). The existence of the separate and distinct elements of premeditation and deliberation is a question of fact to be decided by the jury. See State v. Brown, 836 S.W.2d at 541-42. In this respect, the determination of the state of mind necessary to establish the elements of first degree murder may be shown by circumstantial evidence. State v. Brown, 836 S.W.2d at 541; State v. Burlison, 868 S.W.2d 713, 717 (Tenn. Crim. App. 1993).

Pursuant to T.C.A. § 39-11-402, a defendant may be criminally responsible for the conduct of another. The statute provides:

> A person is criminally responsible for an offense committed by the conduct of another if:
>
> . . .
>
> (2) Acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense;
>
> . . .

T.C.A. § 39-11-402(2).

Common law principles governing aiders and abettors are embraced by the statutory provisions for criminal responsibility. State v. Carson, 950 S.W.2d 951, 955 (Tenn. 1997). To be criminally responsible for the acts of another, a defendant must "associate himself with the venture, act with knowledge that an offense is to be committed, and share in the criminal intent of the principal in the first degree . . . ." Jenkins v. State, 509 S.W.2d 240, 245 (Tenn. Crim. App. 1974). In other words, the defendant "must knowingly, voluntarily and with common intent unite with the principal offenders in the commission of the crime." State v. Foster, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988). A defendant is also held criminally responsible for any other

16

crime committed by the principal offender in pursuance of the common purpose or as a natural and probable consequence of the crime originally aided and abetted by the defendant. Carson, 950 S.W.2d at 955-56.

When the evidence is viewed in the light most favorable to the state, the evidence supports the jury's verdicts. The evidence shows that the defendant admitted that he and Tucker planned to steal the victim's car and drive to Chicago. The defendant went to the victim's apartment unexpectedly at around 11:00 p.m. on September 24, 1992. He acted as if he was going to leave and unlocked the front door to allow Tucker into the victim's apartment. The defendant then began kissing the victim and continued kissing the victim as they moved to the bedroom. The evidence establishes that Tucker entered the bedroom as the defendant and the victim were kissing on the bed. Tucker pointed a gun at the victim and then taped her hands and feet with tape. The victim was then raped.

The evidence establishes that following the rape, Tucker asked the victim whether she had anything to drink. When the victim told Tucker no, either the defendant or Tucker rummaged through the silverware. Tucker then asked the victim where her purse was located, and the victim heard either the defendant or Tucker going through her purse. Tucker then asked the victim if she enjoyed being raped. The victim did not respond when Tucker asked her why she had cried. When the victim asked that her ties be loosened, either the defendant or Tucker lifted the victim's head, placed a white towel around her neck, and then cut her neck and stabbed the left and right side of her neck. Afterwards, either the defendant or Tucker poked the victim's feet with a sharp object. As they were leaving, Tucker went back into the bedroom and told the victim that he knew everything she did and threatened to blow out the victim's brains if she left the apartment. The defendant and Tucker then left the victim's apartment, took the victim's car, and loaded clothes and other personal items in the

17

victim's car and in the defendant's friend's car. The defendant and Tucker then left for Chicago.

The proof shows that after the stabbing, the victim went to a neighbor's apartment. When the neighbor asked the victim what had happened, the victim said repeatedly, "I can't believe he did it." When asked to whom she was referring, the victim replied, "Jazz," referring to the defendant, and then said, "They knew each other." The victim also told Detective Hyde during a brief interview at the hospital that she had been raped, robbed and cut by a black man that she did not know but that the defendant was involved in the crimes.

The evidence establishes that Tucker was driving the victim's car when he was stopped by the police shortly after the crimes occurred. The victim's purse and car keys, a gun and a roll of duct tape were found in the front seat of the victim's car. The proof also shows that the defendant fled to Chicago. When Officer Castro and the other Chicago police officers entered the defendant's mother's residence, the defendant ran and hid in a pantry. After the defendant came out of the pantry, he told his brother that the police were there for the defendant, and he then stated, "I killed her. I killed her." The defendant asked the officers several times about the victim's condition, stating that he knew that the victim had been cut and that he believed that she was dead. The defendant told the police that Tucker bound the victim, raped her, and cut her throat. When the officers told the defendant that the victim was still alive, the defendant said that he and Tucker agreed that the defendant should act like a victim during the robbery. The defendant then admitted that he raped the victim and cut her throat.

With respect to the especially aggravated robbery, the defendant argues that his testimony that he only intended that Tucker sneak into the apartment and get

18

the victim's car keys is uncontradicted by any credible evidence. However, we do not reweigh the evidence or evaluate the credibility of the witnesses. See Cabbage, 571 S.W.2d at 835. We conclude that the jury was entitled to reject the defendant's version of the facts. The evidence is sufficient to convict the defendant of especially aggravated robbery.

As for the attempted first degree murder conviction, the defendant argues that the evidence is insufficient to establish beyond a reasonable doubt the elements of premeditation, deliberation and identity to show that the defendant committed the crimes or that he was criminally responsible for Tucker's conduct. He asserts that the proof does not show that Tucker intended to kill the victim when he cut her throat, given the fact that as he and Tucker were leaving, Tucker went back into the bedroom and threatened to kill the victim if she told anyone what had happened. The defendant claims that his statement to police that he cut the victim's throat after he "got into the violence" of Tucker's attack shows that the defendant was not sufficiently free from passion to have the ability to premeditate or deliberate. The defendant also argues that his testimony that he only intended that Tucker sneak into the apartment and get the victim's car keys is uncontradicted by any credible evidence. The state responds that the evidence shows beyond a reasonable doubt that the defendant either committed the crimes himself or was criminally responsible for the attempted first degree murder of the victim by Tucker. We hold that the evidence is sufficient to convict the defendant of attempted first degree murder under either theory.

We believe that the elements of premeditation and deliberation were established beyond a reasonable doubt. After the rape, Tucker walked into the kitchen, opened the refrigerator, and asked the victim if she had anything to drink. Either the defendant or Tucker rummaged through the silverware and took a knife. Then, they took the victim's keys from her purse. Tucker asked the victim whether she enjoyed

19

being raped and also asked her why she had cried. When the victim asked that her ties be loosened, a towel was placed around her neck, and her neck was then cut and stabbed. These facts show that the attempted killing of the victim was done with a cool purpose and after the exercise of reflection and judgment. The jury was entitled to reject the defendant's version of the facts.

We conclude that substantial evidence was introduced to show that the defendant was the one who tried to kill the victim. The victim told her neighbor that the defendant was the one who had caused her injuries. Also, when the defendant came out of the pantry after fleeing from police, he told his brother that the police were there for the defendant and then stated, "I killed her. I killed her." After being arrested, the defendant asked repeatedly about the victim's condition, stating that he knew that the victim had been cut. The defendant also admitted to police that he had cut the victim's throat.

Substantial evidence was also introduced to show that Tucker cut and stabbed the victim's neck and that the defendant was criminally responsible for Tucker's conduct. The victim told police at the emergency room that she had been cut by a black man that she did not know but that the defendant was involved in the crimes. The defendant told police that Tucker had cut the victim's throat, but he also admitted that the plan to steal the victim's car included that the defendant would act like a victim during the commission of the crime. Although the defendant claimed that he did not know that Tucker would harm the victim or that Tucker possessed a gun, the jury was entitled to reject his testimony. Given the above facts, we hold that the evidence proves beyond a reasonable doubt that either the defendant committed the offense of attempted first degree murder himself or that he was criminally responsible for the act committed by Tucker.

20

## II.  INTRODUCTION OF A BLOODY PILLOWCASE,
## COMFORTER AND T-SHIRT

The defendant contends that the trial court erred by allowing the state to introduce a bloody pillowcase, comforter and T-shirt and that the manner in which the exhibits were shown to the jury was unfairly prejudicial.  The state responds that the items were relevant to show the extent of the victim's injuries and to show that the defendant and Tucker intended to inflict severe injuries and knew that the victim would die as a result of the injuries.  It argues that the items were not unduly prejudicial and were properly admitted by the trial court.  Relative to the manner in which the items were displayed to the jury, the state responds that the method was proper given the bloody nature of exhibits.  It argues that the time used for the display of each item was not excessive.  We conclude that the introduction of the items was not improper and that the method used was an effective means by which to allow the jury to view the exhibits.

The admissibility of evidence as more probative than prejudicial is a matter within the trial court's discretion and will not be reversed on appeal absent a showing of an abuse of that discretion.  State v. Harris, 839 S.W.2d 54, 66 (Tenn. 1992).  Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Tenn. R. Evid. 401.  If the probative value of relevant evidence is "substantially outweighed by the danger of unfair prejudice," it may be excluded.  Tenn. R. Evid. 403.

During the defendant's first trial, the state sought to introduce a sheet, a comforter and a T-shirt that had blood on them and a bloody pillowcase that had duct tape on it.  The defendant objected to their introduction on the ground that they were cumulative evidence given the other proof regarding the victim's condition and her loss of blood.  He asserted that the showing of blood inflamed the jury and was unfairly

21

prejudicial, especially given the common fear of the transmission of diseases through blood. The state acknowledged that some of the items were visible in the photographs of the scene that were to be introduced at trial. It argued that a photograph of the comforter could not be substituted because it could not accurately depict that a person had bled all the way through the comforter. The trial court permitted the state to introduce the bloody pillowcase, comforter and T-shirt because the items' probative value on the issue of the seriousness of the bodily injury outweighed the prejudicial effect. It excluded the bloody sheet, ruling that the evidence was cumulative.

At the present trial, the defendant objected during the victim's testimony to the introduction of the bloody pillowcase, comforter and T-shirt and the manner in which they were to be introduced. As grounds for his objections, the defendant relied upon the arguments made at the first trial, and the transcript of the first trial was made an exhibit. The evidence was admitted over the defendant's objection. The bloody king-size comforter was spread out on the floor, and the victim stepped down to identify it.

The defendant also objected to the introduction of the items and the manner in which they were introduced following Mr. Burns's testimony. The trial court noted the defendant's objection but stated that its earlier ruling governed its decision. The defendant requested that the comforter be put away, and the state responded that the jury should be allowed to see the comforter. The defendant stated for the record that the comforter had remained spread out on the floor for approximately forty-five minutes. The court ruled that the comforter would be folded and would be shown to the jury at a later time.

Following Detective Hyde's testimony, the court requested the prosecutor to use rubber gloves and hold up the pillowcase and T-shirt for the jurors to see. The court also asked the prosecutor to unfold the comforter on the floor to allow the jurors to

22

view it. Defense counsel objected to the methods used to allow the jurors to view the exhibits. The trial court overruled the defendant's objection. It instructed the jurors that they could but were not required to step out of the jury box to examine the comforter. The court told the jurors that they were not permitted to discuss the exhibits. All of the jurors and the alternate jurors, with the exception of one juror, stepped down to view the comforter. One juror requested that they be shown the T-shirt, and the trial court stated that it would be shown in a few minutes. The trial court then asked the prosecutor to hold up and show the jury both sides of the T-shirt and the pillowcase, and the prosecutor complied. The jury was excused, and defense counsel objected again to the manner in which the exhibits were displayed for the jury's viewing. Defense counsel stated for the record that the comforter was laid out on the floor of the courtroom fully unfolded. He said that the jurors moved out of the jury box and stood over the comforter for approximately two to three minutes. He stated that the prosecutor also held the T-shirt approximately two to three feet away from the jurors and walked slowly back and forth in front of them for about thirty-five seconds. Defense counsel said that the same procedure was used for the pillowcase but that the procedure lasted approximately fifty seconds.

Defense counsel argued that the manner in which the exhibits were displayed unnecessarily emphasized the prejudicial impact on the jury. He argued that the victim's testimony and the photographs sufficiently allowed the jury to consider the evidence. He then requested a mistrial. The prosecutor responded that the method of display used was not improper given the fact that he followed the trial court's instructions, although he conceded that he had not often used the method. He argued that the method was necessary because not all jurors could fully view the comforter without it being fully unfolded and because the items could not be passed to the jury unless gloves were provided.

23

The court overruled the defendant's objections and request for a mistrial. It relied on its earlier ruling that the evidence was admissible given the seriousness of the victim's injuries. It stated that because of the need to protect the jury for sanitary reasons and because not all jurors could see the comforter clearly, it was necessary that the jurors be allowed to come down and see the comforter spread out on the floor. It said that the pillowcase and the T-shirt were displayed to the jury with the prosecutor's back to the jury.

We hold that the trial court properly concluded that the bloody pillowcase, comforter and T-shirt were probative of the issue of whether the victim suffered serious bodily injury. However, we note that the probative value of the evidence is somewhat diminished given the other evidence in the case. The victim's neighbor testified that blood was all over the victim's door and in her apartment. He said that the victim was pale and had lost a lot of blood. Dr. Enderson also testified that the victim had lost a significant amount of blood and that had surgery not been performed, the victim would have been in grave danger of dying as a result of the loss of blood. Also, a couple of the photographs of the scene showed blood on the comforter. Because this evidence was presented and because the issue was not contested by the defendant, the admission of the comforter could be viewed as cumulative evidence, and the need for it on the issues of serious bodily injury and intent was minimized. However, the evidence was also probative to show the intent of the defendant and Tucker to kill the victim given the fact that they left the victim even though she was bleeding greatly. The issue of intent was heavily contested.

We recognize that the presence of blood on the exhibits presented a danger of inflaming the jury. Although we view the issue to be a close one, we are unable to conclude that the probative value of the evidence was substantially outweighed by the risk of unfair prejudice. See Tenn. R. Evid. 403. Moreover, the fact

24

that the jury found the defendant not guilty of raping the victim indicates that the jury did not base its verdicts upon passion.

We also conclude that the method used to display the exhibits did not unfairly emphasize their prejudicial nature. Rather, the display was relatively brief, and the trial court took great care to protect the jurors from being exposed to the blood without hindering their ability to view and to consider the evidence as it related to the issues at trial. We hold that the exhibits were properly introduced and displayed to the jury.

### III. INTRODUCTION OF PHOTOGRAPH OF VICTIM'S SCARS

The defendant asserts that the trial court erred by admitting a photograph of the victim's scars. He argues that the photograph should have been excluded because it created a danger of confusing or misleading the jury given the fact that the photograph showed scars other than those caused by the attack on the victim. He also argues that the photograph should have been excluded as cumulative evidence because uncontradicted eyewitness and expert testimony established the location and the severity of the victim's wounds and because the victim could have displayed her injuries to the jury during her testimony. The state responds that the photograph was properly admitted to show the extent of the victim's injuries. It argues that there was little chance that the jury was confused by the nature of the scars depicted in the photograph because Dr. Enderson fully explained the scars. We hold that the photograph was properly admitted.

The leading case in Tennessee regarding the admissibility of photographs of murder victims is State v. Banks, 564 S.W.2d 947 (Tenn. 1978), in which the supreme court held that the determination of admissibility is within the discretion of the trial court after considering the relevance, probative value and potential unfair

25

prejudicial effect of such evidence. <u>See</u> Tenn. R. Evid. 403. The general rule, as stated in <u>Banks</u>, is that "photographs of the corpse are admissible in murder prosecutions if they are relevant to the issues on trial, notwithstanding their gruesome and horrifying character." 564 S.W.2d at 950-51. On the other hand, "if they are not relevant to prove some part of the prosecution's case, they may not be admitted solely to inflame the jury and prejudice them against the defendant." <u>Id</u>. at 951.

Thus, even relevant evidence should be excluded if its probative value is substantially outweighed by the danger of unfair prejudice to the defendant. <u>Id</u>.; <u>see also</u> Tenn. R. Evid. 403. In <u>Banks</u>, the court stated, "The more gruesome the photographs, the more difficult it is to establish their probative value and relevance outweigh their prejudicial effect." 564 S.W.2d at 951.

The single photograph of the victim that was introduced in this case was taken on October 15, 1992, when she left the hospital. The closeup, eight and a half inches by eleven inches, shows the victim from the chest upward. It depicts three large scars on the victim's neck. The victim testified that there were more injuries than those depicted in the photograph but that the photograph accurately reflected her condition on October 15.

Dr. Enderson identified the photograph of the victim's scars. He stated that it showed the victim's wound across her neck with a dip where the tracheotomy had been located. He said that the photograph also showed a wound over the victim's collarbone extending downward to the breastbone where exploratory surgery had been conducted for a bleeding vessel.

We hold that the photograph introduced in this case was relevant to show the extent of the victim's injuries, necessary proof for either an especially aggravated

26

robbery or an aggravated rape conviction as charged in the indictment. See State v. Norris, 874 S.W.2d 590, 597 (Tenn. Crim. App. 1993) (photographs admissible to show extent of victim's injuries in aggravated assault case). Dr. Enderson's use of the photograph allowed him to explain better his testimony regarding the extent of the victim's injuries.

We also note that the picture's probative value is somewhat diminished given the other evidence in the case. However, the photograph was not gruesome. Also, we believe that the thorough explanation given by Dr. Enderson regarding the cause of the scars prevented the jury from being confused or misled. In weighing the probative value of the photograph against its risk of unfair prejudice, we are unable to conclude that the photograph's probative value was substantially outweighed by the risk of unfair prejudice. See Tenn. R. Evid. 403. Therefore, we hold that the trial court did not abuse its discretion in admitting the photograph of the victim into evidence. Also, the prosecution could but was not required to have the witness reveal her scars during her testimony. See State v. Hill, 885 S.W.2d 357, 360-61 (Tenn. Crim. App. 1994) (trial court did not abuse its discretion in permitting the jury to view the victim's scars for the purpose of determining the location of the wounds).

## IV. INSTRUCTIONS ON LESSER INCLUDED OFFENSES

The defendant contends that the trial court erred by failing to instruct the jury on the lesser included offense of theft. The defendant also asserts that the trial court erred by failing to instruct the jury on the lesser included offenses of attempted second degree murder, aggravated assault and facilitation of the offenses. The state responds that the trial court properly refused to instruct the jury relative to the lesser included offenses because the evidence does not support the instructions. We hold that the trial court erred by failing to instruct on theft but that the error did not affirmatively affect the verdict, given the jury's verdict of guilt on the greater offense of

especially aggravated robbery and its rejection of the lesser included offenses of aggravated robbery and robbery. However, we conclude that a reversal is required relative to the attempted first degree murder charge because the trial court failed to instruct the jury on the lesser included offense of attempted second degree murder.

Pursuant to T.C.A. § 40-18-110(a), a trial court is required "to charge the jury as to all of the law of each offense included in the indictment, without any request on the part of the defendant to do so." When the evidence, introduced by either the state or the defendant, is susceptible of inferring guilt of either a lesser grade or lesser included offense, the trial court has a mandatory duty to charge such lesser offense. See T.C.A. § 40-18-110(a); State v. Trusty, 919 S.W.2d 305, 310 (Tenn. 1996); Johnson v. State, 531 S.W.2d 558, 559 (Tenn. 1975).

In this case, the defendant was charged with especially aggravated robbery and attempted first degree murder. The trial court instructed the jury on especially aggravated robbery and the lesser included offenses of aggravated robbery and robbery. Relative to the lesser included offense of aggravated robbery, the trial court instructed the jury that the aggravating element could be either the use or display of a deadly weapon or the victim suffering serious bodily injury. See T.C.A. § 39-13-402(a)(1) and (2). The trial court also instructed the jury regarding criminal responsibility and criminal responsibility for the facilitation of the crime of especially aggravated robbery and its lesser included offenses. The trial court instructed the jury regarding criminal responsibility relative to the charge of attempted first degree murder, but it gave no lesser included offense instructions.

The defendant requested that the trial court instruct the jury on theft, but the request was denied. The trial court ruled that the proof did not fairly raise theft but rather the proof showed that a robbery was committed. The defendant also asked the

court to instruct the jury on facilitation. The state objected to the giving of a facilitation instruction. The trial court ruled that given the defendant's testimony, the jury should be instructed relative to facilitation but only as to the offenses of especially aggravated robbery, aggravated robbery and robbery.

After the charge, the defendant asserted that relative to the attempted first degree murder charge, the trial court should have instructed the jury as to the lesser included offenses of attempted second degree murder and aggravated assault. The defendant argued that there was evidence of passion and that Tucker lacked the intent to kill as evidenced by his statement to the victim that if she came out of the apartment, he would blow off her head.

## A. LESSER INCLUDED OFFENSE OF THEFT

First, the defendant contends that the trial court should have given a lesser included offense instruction on theft. He argues that a theft instruction was warranted given his testimony that he intended that only a theft take place. In support of his argument, the defendant relies upon State v. King, 905 S.W.2d 207 (Tenn. Crim. App. 1995), overruled on other grounds by State v. Willie Williams, Jr., No. 03-S-01-9706-CR-00060, Hamilton County, slip op. at 11 n.7 (Tenn. Sept. 21, 1998) (for publication) (the failure to instruct the jury on a lesser included offense does not implicate the constitutional right to a trial by jury, and thus, the error is subject to harmless error review under Rule 36(b), T.R.A.P., and Rule 52(a), Tenn. R. Crim. P.). In King, this court held that the trial court erred by failing to instruct the jury on theft, a lesser included offense of aggravated robbery of an automobile. Id. at 214. The court determined that the trial court failed to consider the defendant's version of the facts that he denied using a gun or using force to obtain the vehicle. Id. The state responds that, unlike King, the evidence in this case shows that a robbery and not a theft occurred, and thus, a theft instruction was not supported by the evidence.

29

We hold that the trial court should have instructed the jury regarding the lesser included offense of theft. For a conviction based on a theory of criminal responsibility, the defendant must share in the criminal intent of the principal. Carson, 950 S.W.2d at 954. In the light most favorable to the giving of the lesser included offense instruction, the proof shows that the defendant intended for Tucker to enter the apartment and take the victim's keys while the defendant was in the bedroom with the victim. The defendant claimed that he did not know that Tucker intended to harm the victim, and he said that he had not earlier seen Tucker with a gun. Under these facts, it could be determined that the defendant did not share in the criminal intent of Tucker that the property be taken from the victim by violence or by putting the victim in fear. Therefore, the evidence is susceptible of inferring that the defendant was guilty of the lesser included offense of theft. Thus, we conclude that the trial court erred by not giving a theft instruction.

Having determined that the trial court erred by failing to give a theft instruction, we must now determine the effect of the error. Recently, our supreme court concluded that an error relating to the failure to instruct on a lesser included offense is subject to harmless error analysis under Rule 36(b), T.R.A.P., and Rule 52(a), Tenn. R. Crim. P. State v. Willie Williams, Jr., No. 03-S-01-9706-CR-00060, Hamilton County, slip op. at 9-10 (Tenn. Sept. 21, 1998) (for publication).[4] "Reversal is required if the error affirmatively appears to have affected the result of the trial on the merits, or in other words, reversal is required if the error more probably than not affected the judgment to the defendant's prejudice." Id., slip op. at 9. In Williams, a first degree murder case, the court held that although the trial court erred by failing to instruct the jury on voluntary manslaughter, the error did not affirmatively affect the verdict given the fact that the defendant was convicted of the greatest charge, even though the jury was

_____

[4]We note that in Williams, the court held that the harmless beyond a reasonable doubt standard was met, as well. Williams, slip op. at 11.

charged with the lesser included offense of second degree murder. <u>Id</u>., slip op. at 10-14.

Applying the principles set forth in <u>Williams</u>, we hold that the error in failing to instruct on theft did not affirmatively affect the verdict in this case. The trial court instructed the jury on especially aggravated robbery and its lesser included offenses of aggravated robbery and robbery. The court also instructed the jury regarding criminal responsibility for the conduct of another and criminal responsibility for the facilitation of the felonies of especially aggravated robbery, aggravated robbery and robbery. By convicting the defendant of especially aggravated robbery to the exclusion of the other lesser included offenses, the jury necessarily rejected all other lesser included offenses, including theft. <u>See id</u>., slip op at 11. Given the jury's verdict of guilt on the greater offense and its disinclination to convict the defendant of the lesser included offenses, we conclude that the trial court's erroneous failure to instruct the jury on theft not only did not affirmatively affect the verdict, but was harmless beyond a reasonable doubt, as well.

### B. LESSER INCLUDED OFFENSES OF ATTEMPTED SECOND DEGREE MURDER, AGGRAVATED ASSAULT, AND FACILITATION OF THE OFFENSES

Next, the defendant asserts that the trial court should have instructed the jury on the lesser included offenses of attempted second degree murder, aggravated assault and facilitation of these offenses. He argues that the lesser included offense instructions are supported (1) by evidence that Tucker threatened to kill the victim after the cutting and the stabbing of the victim's throat and (2) by evidence that the defendant told the officers that he cut the victim's throat after he "got into the violence" of Tucker's attack.

31

Initially, we note that aggravated assault is not a lesser included offense of attempted first degree murder. See Trusty, 919 S.W.2d at 311-12. Accordingly, there was no duty to instruct on that offense.

However, the proof in this case supports an instruction on the lesser included offense of attempted second degree murder. There was proof from which the jury could have concluded that the defendant did not have the intent, premeditation and deliberation necessary for an attempted first degree murder conviction. The defendant told the Chicago police officers that he "got into the violence" of Tucker's act and cut the victim's throat. There was also evidence from which the jury could conclude that Tucker did not intend to kill the victim with premeditation and deliberation when he cut her throat, and therefore, the defendant could not be criminally responsible for attempted first degree murder. The defendant testified that as they were leaving, Tucker went back into the bedroom and said something to the victim. The victim stated that Tucker threatened to kill her if she left the apartment. From this evidence, the jury could infer that Tucker did not intend for the victim to die from the cutting and stabbing of her neck.

We hold that this evidence could support a verdict for attempted second degree murder. Second degree murder is defined as a knowing killing of another. T.C.A. § 39-13-210(a)(1). Pursuant to T.C.A. § 39-11-302(b):

> "Knowing" refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

The proof raised a factual issue with respect to the defendant's and Tucker's mental states, and the trial court should have submitted the issues to the jury.

Therefore, we hold that the trial court erred by failing to instruct the jury on the lesser included offense of attempted second degree murder.

Likewise, and for the same reasons, the evidence in this case supports an instruction on facilitation. Pursuant to T.C.A. § 39-11-403(a):

> A person is criminally responsible for the facilitation of a felony if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony.

As the sentencing commission comments note, T.C.A. § 39-11-403 applies to a person "who lacks the intent to promote or assist in, or benefit from, the felony's commission." Facilitation may be a lesser included offense of a crime when a conviction is sought based on criminal responsibility under T.C.A. § 39-11-402(2). See State v. Utley, 928 S.W.2d 448, 451-52 (Tenn. Crim. App. 1995). The degree of the defendant's culpability in the attempted murder was at issue under the evidence. The issue of facilitation should have been placed before the jury.

Having determined that the trial court erred by failing to give attempted second degree murder and facilitation instructions, we must now determine the effect of the errors under Williams, slip op. at 9-10. Unlike Williams, the jury was given only one option, attempted first degree murder under a principal or criminal responsibility theory. See Williams, slip op. at 10 n.6 (distinguishing case from circumstances where the jury is given only one option and the proof would have supported another offense). We hold that the errors more probably than not affected the judgment to the defendant's prejudice. See Tenn. R. Crim. P. 52(a); T.R.A.P. 36(a). Therefore, a reversal is required, and the case is remanded for a new trial relative to the attempted first degree murder charge.

## V. INSTRUCTION ON THE DEFENSE OF DURESS

33

The defendant contends that the trial court erred by refusing to instruct the jury on the defense of duress. He argues that the evidence fairly raises the issue. The defendant acknowledges that the defense of duress is "unavailable to a person who intentionally, knowingly, or recklessly becomes involved in a situation in which it was probable that the person would be subjected to compulsion." See T.C.A. § 39-11-504. However, he argues that it was unforeseeable that Tucker would come into the apartment armed with a firearm and bind the victim. The state responds that the defense of duress was not available to the defendant under T.C.A. § 39-11-504(b) because the defendant intentionally placed himself in a situation where he knew he could be subjected to do other things by Tucker once the robbery began. It also argues that the defense is not fairly raised by the evidence.

A bench conference was held during the jury charge, and the defendant requested that the court instruct the jury regarding the defense of duress. The trial court denied the defendant's request. It stated after charging the jury that it denied the defendant's request for an instruction on duress for the following two reasons:

> One was, that I was half-way through reading the jury instructions. Most importantly, that I did not believe that the charge of duress would be appropriate at this time. I think . . . the jury must decide whether or not Mr. Cowart was a party to this offense . . . . If he was not a party to this offense, . . . I think the issue of duress is not appropriate. If he was a party I think the issue of duress is appropriate.

At the motion for new trial, the court stated that the defense of duress was not supported by the evidence.

In criminal cases, the trial court has a duty to charge the jury on all of the law that applies to the facts of the case. State v. Harris, 839 S.W.2d 54, 73 (Tenn. 1992). Anything short of a complete charge denies a defendant his constitutional right to trial by a jury. State v. McAfee, 737 S.W.2d 304, 308 (Tenn. Crim. App. 1987).

34

However, a trial court is not required to give a special request where the general charge is complete.

A defendant is entitled to have the issue of the existence of a defense being submitted to the jury when it is fairly raised by the proof. See T.C.A. § 39-11-203(c) and (d). To determine if it is fairly raised by the proof, "a court must, in effect, consider the evidence in the light most favorable to the defendant, including drawing all reasonable inferences flowing from that evidence." State v. Shropshire, 874 S.W.2d 634, 639 (Tenn. Crim. App. 1993). This is because it would be improper for a court to withhold a defense from the jury's consideration because of judicial questioning of any witness credibility. Id.

With respect to the defense of duress, a person is justified to act under duress under the following circumstances:

> Duress is a defense to prosecution where the person or a third person is threatened with harm which is present, imminent, impending and of such a nature to induce a well-grounded apprehension of death or serious bodily injury if the act is not done. The threatened harm must be continuous throughout the time the act is being committed, and must be one from which the person cannot withdraw in safety. Further, the desirability and urgency of avoiding the harm must clearly outweigh, according to ordinary standards of reasonableness, the harm sought to be prevented by the law proscribing the conduct.

T.C.A. § 39-11-504(a). However, the defense of duress is "unavailable to a person who intentionally, knowingly, or recklessly becomes involved in a situation in which it was probable that the person would be subjected to compulsion." T.C.A. § 39-11-504(b).

We hold that irrespective of whether the evidence raised the defense of duress, the defense was not available to the defendant under T.C.A. § 39-11-504(b). The defendant admitted that he agreed to allow Tucker into the victim's apartment to rob the victim of her car, knowing that the victim would be inside the apartment. By

35

doing so, he intentionally placed himself in a situation in which it was probable that he could be subjected to compulsion. See T.C.A. § 39-11-504(b). In this regard, we reject the defendant's argument that it was unforeseeable that Tucker would use a weapon or bind the victim given the fact that he had not seen Tucker with a gun and did not expect that weapons would be used. See T.C.A. § 39-11-504(b). We conclude that under the circumstances of this case, an instruction on the defense of duress was not appropriate. This issue is without merit.

## VI. INSTRUCTION ON CRIMINAL RESPONSIBILITY AND MERE PRESENCE

The defendant asserts that the trial court erred by failing to instruct the jury that the defendant must have the specific intent to commit the crime to be found guilty under a criminal responsibility theory. The defendant argues that the trial court should have instructed the jury that to find the defendant guilty under a criminal responsibility theory, the prosection must prove beyond a reasonable doubt that the defendant specifically intended for Tucker to rape, to rob, and to attempt to murder the victim. The defendant contends that the refusal of his special request allowed the jury to convict the defendant upon a lower standard of proof. In support of his argument, the defendant relies upon State v. Williamson, 919 S.W.2d 69 (Tenn. Crim. App. 1995), in which this court held that "the culpable mental state of an aider and abettor is 'intentional.'" Id. at 77, 80. The defendant also complains that the trial court erred by refusing to instruct the jury on mere presence. The state responds that the criminal responsibility instruction fully covered the issue of specific intent, given the fact that the instruction required the jury to find that the defendant acted with intent and intent is synonymous with "intention" and "intentional." See Williamson, 919 S.W.2d at 76. It also contends that the trial court correctly concluded that there was no evidence to support an instruction on mere presence and that in any event, the criminal responsibility instruction fully covered the issue of mere presence. We hold that the trial court appropriately instructed the jury.

36

At the close of the proof, the defendant requested that the trial court instruct the jury relative to mere presence, and the trial court denied the request, stating that it was covered by the charge. The court stated at the motion for new trial hearing that given the defendant's own testimony that he planned to help Tucker steal the victim's car, an instruction on mere presence was not supported by the evidence.

Relative to the criminal responsibility instruction, the defendant objected to the instruction given by the trial court, arguing that the instruction should state that the defendant must have the specific intent to commit the crime. The trial court overruled the defendant's objection, stating that specific intent relative to criminal responsibility was included in the charge.

The trial court gave the following criminal responsibility instruction:

> The defendant is criminally responsible as a party to the offenses of aggravated rape and its lesser included offenses as charged in count four, attempt to commit first degree murder as charged in the fifth count, if the offenses were committed by the defendant's own conduct, or by the conduct of another for which the defendant is criminally responsible, or by both. Each party to the offense may be charged with the commission of the offense[.]

> The defendant is criminally responsible for an offense committed by the conduct of another if, acting with the intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the defendant solicits, directs, aids, or attempts to aid another person to commit the offense.

> Before you find the defendant guilty of being criminally responsible for said offenses committed by the conduct of another, you must find that all the essential elements of said offenses have been proven by the state beyond a reasonable doubt.

The instruction given by the trial court mirrors the pattern jury instruction contained in T.P.I.-Crim. 3.01 (4th ed.). Also, the language used in the second paragraph mirrors the statutory definition contained in T.C.A. § 39-11-402(1) and is virtually identical to T.P.I.-Crim. 3.01 (3d ed.), except that the sentence is restructured.

37

We hold that the instruction given by the trial court correctly defines the mental state required for a defendant to be found criminally responsible for a crime committed by another. The criminal responsibility instruction given by the trial court required the jury to find beyond a reasonable doubt that the defendant acted with the intent to promote or assist Tucker in the commission of the crimes. See Carson, 950 S.W.2d at 954. The trial court also defined the term "intent." Under these circumstances, we hold that the trial court did not err by refusing to give the defendant's request for a more specific instruction given the fact that the request was completely covered by the criminal responsibility instruction given by the trial court.

As for the defendant's claim that the trial court erred by failing to instruct the jury regarding mere presence, we note that a trial court should give a requested instruction (1) if it is supported by the evidence, (2) if it embodies the party's theory of the case, (3) if it is a correct statement of the law, and (4) if its substance has not already been included in other portions of the charge. Mitchell v. Smith, 779 S.W.2d 384, 390-91 (Tenn. Ct. App. 1989). We believe that the issue of mere presence is fairly raised by the evidence given the defendant's testimony that he did not know that Tucker planned on harming the victim and the proof that the defendant was tied in the hallway as Tucker committed the acts against the victim. Further, it is a correct statement of the law that the mere presence at the scene of a crime does not make a person an aider and abettor of the crime. See State v. West, 767 S.W.2d 387, 397 (Tenn. 1992); Anglin v. State, 553 S.W.2d 616, 619 (Tenn. Crim. App. 1977).

However, the issue of mere presence was already included in other portions of the charge. The criminal responsibility instruction given by the trial court necessarily included the principle the defendant wanted to convey to the jury. In this regard, we also note that the defendant was allowed to argue the principle of mere presence to the jury during closing argument. We have no doubt that the jury

38

considered the principle of mere presence in its analysis of the defendant's guilt under a theory of criminal responsibility for Tucker's conduct. Although we agree that a separate instruction on mere presence would have better explained the principle of mere presence, we cannot say that it was error to omit an instruction on mere presence under the circumstances of this case. Because the requested instruction on mere presence is inherent in the criminal responsibility instruction given, we conclude that the trial court did not err by omitting a mere presence instruction. See State v. James W. Taylor, No. 01C01-9501-CC-00002, Montgomery County, slip op. at 4-5 (Tenn. Crim. App. June 22, 1995) (issue of mere presence is fully covered by a criminal responsibility instruction, and thus, a separate instruction on mere presence is not necessary).

## VII. INSTRUCTION ON REASONABLE DOUBT

The defendant asserts that the trial court improperly instructed the jury regarding the burden of proof. He argues that the instruction given by the trial court included the term "moral certainty" and allowed the jury to convict him upon less proof than constitutionally required. The trial court gave the following reasonable doubt instruction:

> Reasonable doubt is that doubt engendered by an investigation of all the proof in the case and an inability, after such investigation, to let the mind rest easily as to the certainty of guilt. Reasonable doubt does not mean a captious, possible or imaginary doubt. In order to convict a defendant of any criminal charge, every element of proof required to constitute the offense must be proven to a moral certainty, but absolute certainty of guilt is not demanded by the law.

See T.P.I. - Crim. 2.03 (3d ed.). This is a correct statement of the burden of proof required for criminal trials in Tennessee. See Hardin v. State, 210 Tenn. 116, 355 S.W.2d 105 (1962); State v. Nichols, 877 S.W.2d 722, 734 (Tenn. 1994); State v. Sexton, 917 S.W.2d 263, 266 (Tenn. Crim. App. 1995); Pettyjohn v. State, 885 S.W.2d 364, 366 (Tenn. Crim. App. 1994). Therefore, the instruction was properly given.

## VIII. ACCEPTANCE OF JURY VERDICT

39

The defendant contends that the trial court erred by accepting the verdict of guilt for especially aggravated robbery because the range of punishment sheet notes "N.G." next to the offense of especially aggravated robbery. He argues that the notation reflects that the jury reached a verdict different from the guilty verdict reported to the court, and he argues that the contradictory findings render uncertain the verdict returned by the jury. The state responds that the trial court properly accepted the jury's verdict. We agree.

At the conclusion of the deliberations, the foreperson reported that the jury had found the defendant not guilty of the rape charges contained in counts one, two and three, reporting the jury's not guilty verdicts in order of the charged offense followed by its lesser included offenses. When asked by the trial court whether the jury had reached a verdict relative to the especially aggravated robbery charge contained in count four, the foreperson stated that the jury found the defendant guilty. The trial court asked, "Of especially aggravated robbery?" and the foreperson nodded affirmatively and stated, "Yes." The foreperson stated that the jury also found the defendant guilty of attempted first degree murder as charged in count five. The trial court repeated the findings to the foreperson, and the foreperson replied that the findings represented the verdicts reached by the jury. When asked whether the verdicts represented the decision of the jury, all twelve jurors raised their hands. The trial court then dismissed the jury.

After the jury was dismissed, the bailiff gave the trial court the written jury charge used by the jury during deliberations. The written jury charge included an instruction on the range of punishments relative to the offenses charged and their lesser included offenses. The trial court informed the parties that the jury had made notes on the range of punishment sheet during jury deliberations reflecting a not guilty decision with respect to the charge of especially aggravated robbery. The court said

40

that it did not know what the notes meant, but it believed that the jury returned a guilty verdict and answered unanimously to that verdict. It stated that it had told the foreperson that it would read through the range of punishment list when asking for the jury's verdict. It said that it did not do that exactly but rather asked for the jury's verdict by the count number followed by its lesser included offenses.

The range of punishment sheet and the jurors' copies of the indictments containing handwritten notes were introduced into evidence. The range of punishment sheet contains handwritten notes beside each offense for which the defendant was charged and its range of punishment, including lesser included offenses. Beside the charge of especially aggravated robbery are the letters "N.G." The letter "G" is marked next to the criminal responsibility for facilitation of especially aggravated robbery. Two copies of the indictments also contain notes in handwriting similar to that on the range of punishment sheet. The indictments state "NOT GUILTY" beside the rape charges contained in counts one, two and three and state "GUILTY" beside the charges of especially aggravated robbery and attempted first degree murder contained in counts four and five. The trial court accepted the jury's verdict of guilt for especially aggravated robbery and sentenced the defendant to the maximum sentence of twenty-five years.

At the motion for new trial hearing, the defendant did not present any proof relative to the meaning of the notes contained on the range of punishment sheet or the copies of the indictments. The defendant conceded that the jury orally returned a verdict of guilty for the offense of especially aggravated robbery. However, he argued that there was a conflict between the range of punishment sheet and copies of the indictments.

41

The trial court overruled the defendant's motion for new trial, concluding that the jury's verdict was not unclear, given the foreperson's report of guilt as to the especially aggravated robbery count and each juror's affirmation by raising his or her hand that the verdict accurately reflected his or her decision. It stated:

> If you all will recall, the jury came back and actually handed me a work sheet of theirs, not something that we had requested, which basically was unclear to me as to what they had written, or what their verdict was.
>
> As a result of that and after showing that . . . to you all ahead of time, we brought the jury in and one by one, as we went through the charges that had been given and the indictment, I went through the indictment and asked the foreperson . . . what the verdict was. And one by one the presiding juror told us a specific verdict, which did not always meet with what the work sheet said. Ah, because there was a variation I asked the jurors whether this was their verdict and all answered affirmatively. In fact, Mr. Cowart was acquitted of a number of the charges and . . . convicted of two charges. And based upon what the jury said in open Court . . . and their positiveness about what their verdict was as to each of those charges, I think the fact that they had brought us a work sheet that had some other things written on it . . . is not . . . indicative of a confusion by the jury or . . . a feeling that they should have rendered a different verdict in open Court.

A jury verdict must be in language that is clear and certain in order that its meaning can reasonably be determined. State v. Hensley, 774 S.W.2d 908, 915 (Tenn. 1989); State v. Smith, 836 S.W.2d 137, 143 (Tenn. Crim. App. 1992). If the court considers the verdict to be unclear, it should request the jury to return to deliberations and direct the jury to amend the verdict and put it in proper form. Smith, 836 S.W.2d at 143.

We do not believe that the verdict returned by the jury is ambiguous. Rather, the jury rendered an oral verdict that was clear, concise and could not be mistaken.[5] The foreperson reported that the jury found the defendant guilty of

---

[5]We note that verdict forms were not used by the trial court. Written verdict forms often assist the jury in the rendering of a verdict and the trial court in insuring the accuracy of the reported verdict relative to the offenses charged.

especially aggravated robbery and twice confirmed that the verdict was that rendered by the jury when questioned by the trial court. Also, all of the jurors raised their hands when the trial court asked whether the verdict represented their decision. Although the range of punishment sheet and the copies of the indictments contain handwritten notes, no proof was introduced as to the author of the notes, when the notes were written, or the meaning of the notes. Therefore, we hold that upon the record before us, the trial court properly accepted the jury's verdict for especially aggravated robbery and sentenced the defendant to twenty-five years.

## IX. SENTENCING

The defendant asserts that the trial court erred in its application of enhancement and mitigating factors and erred by imposing consecutive sentences. He argues that the sentence is excessive. The state responds that the trial court properly sentenced the defendant to a total of forty-five years in the custody of the Department of Correction.

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. T.C.A. § 40-35-401(d). As the Sentencing Commission Comments to this section note, the burden is now on the defendant to show that the sentence is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial

43

court considered the sentencing principles and all relevant facts and circumstances."
State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In this respect, for the purpose of meaningful appellate review,

> the trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. T.C.A. § 40-35-210(f) (1990).

State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994).


Also, in conducting a de novo review, we must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf and (7) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-102, -103 and -210; see Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229, 236-37 (Tenn. 1986).


The sentence to be imposed by the trial court is presumptively the minimum in the range unless there are enhancement factors present. T.C.A. § 40-35-210(c).[6] Procedurally, the trial court is to increase the sentence within the range based upon the existence of enhancement factors and, then, reduce the sentence as appropriate for any mitigating factors. T.C.A. § 40-35-210(d) and (e). The weight to be afforded an existing factor is left to the trial court's discretion so long as it complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record. T.C.A. § 40-35-210, Sentencing Commission Comments; Moss, 727 S.W.2d at 237; see Ashby, 823 S.W.2d at 169.

---

[6]For Class A felonies committed on or after July 1, 1995, the presumptive sentence is the midpoint of the range. See T.C.A. § 40-35-210(c).

At the sentencing hearing, Probation Officer Laura Thompson testified that she prepared two presentence reports: one on March 24, 1995, and the other on April 18, 1995. She said that the defendant refused to be interviewed when she conducted the first report. She stated that during the interview for the second report, the defendant refused to discuss his employment history. The first presentence report reflects that the then twenty-eight-year-old defendant had prior convictions for driving on a suspended license, criminal trespass, and theft of services and a prior conviction for desertion while in the United States Navy. It also states that the defendant had several other charges that had been dismissed.

The second presentence report reflects that the defendant is a high school graduate and that he attended a business college but had to quit due to financial difficulties. The defendant reported having kidney problems but was not under a physician's care and was not disabled. The report shows that the defendant claimed that he did not have a drinking problem, but he conceded that he began drinking when he was sixteen and stopped drinking in 1992. The defendant also admitted that he drank a few beers occasionally. The presentence report reflects that the defendant admitted that he had used illegal drugs, including marijuana, in the past, although he claimed that he had stopped using the drugs. The defendant reported that he first used marijuana when he was sixteen years old. It shows that the defendant worked for a total of four months for two different employers in 1992. It shows that the defendant reported that he had been a seaman in the United States Navy but that he had received less than an honorable discharge because he had been absent without leave on several occasions.

The defendant objected to the presentence reports' references to the charges that had been dismissed. Probation Officer Thompson stated that she obtained the criminal history information from an NCIC report. On cross-examination,

she stated that the defendant also admitted to her that he had prior convictions for trespassing and a motor vehicle charge.

The victim testified that the offenses had changed her life. She said that the defendant's actions had hurt her and her family. She also stated that her body had been permanently damaged.

The defendant made a statement to the court and to the victim. He stated that he believed that he had been wrongly convicted because he was innocent but that he wanted to express his apologies to the victim for what happened to her. He said that he did not intend for the crimes to occur. The defendant acknowledged that saying that he was sorry would not reconcile the pain she and her family had suffered but hoped that it would help heal her pain.

At the conclusion of the sentencing hearing, the trial court sentenced the defendant as a Range I, standard offender to twenty-five years and twenty years in the custody of the Department of Correction for the especially aggravated robbery and attempted first degree murder convictions, respectively. Relative to both offenses, the court applied the following enhancement factors pursuant to T.C.A. § 40-35-114:

> (2) the defendant was a leader in the commission of an offense involving two or more criminal actors;
>
> (5) the defendant treated or allowed the victim to be treated with exceptional cruelty during the commission of the offense; and
>
> (15) the defendant abused a position of private trust.

The court applied factor (5) based on the rape of the victim. It noted that the jury found the defendant not guilty of the raping the victim, but it concluded that the proof established by a preponderance of the evidence that either the defendant raped the victim or allowed Tucker to do so.

46

With respect to the attempted first degree murder conviction, the trial court also applied enhancement factor (6), the personal injuries sustained by the victim were particularly great, and enhancement factor (16), the offense was committed under circumstances under which the potential for bodily injury to a victim was great. Regarding the applicability of enhancement factor (1), the defendant has a previous history of criminal convictions or criminal behavior, the trial court delayed its decision until its discussion of consecutive sentencing. At that time, the court noted that many of the charges had been dismissed or had been obtained through an NCIC report and thus could be considered by the court for extraordinarily limited purposes. It found, though, that the defendant admitted some of the offenses to Probation Officer Thompson. However, it did not state whether it was applying enhancement factor (1) to enhance the defendant's sentences. The court also did not state that it was considering the defendant's prior criminal history for purposes of consecutive sentencing.

In mitigation, the trial court considered the defendant's lack of a prior felony record. See T.C.A. § 40-35-113(13). It refused to consider mitigating factors (1), (9), (10), (11), and (12) and the defendant's remorsefulness and good work history pursuant to T.C.A. § 40-35-113(13). The court found the defendant's testimony to be incredible.

The trial court also determined that the defendant was a dangerous offender pursuant to T.C.A. § 40-35-115(b)(4) and ordered him to serve his sentences consecutively for a total of forty-five years incarceration. The court found that the defendant was a dangerous offender given his unusual behavior relative to the offenses and his unusual lifestyle pattern. It stated that the defendant claimed that Tucker did everything but that the defendant did nothing to protect the victim. It also said that the defendant did not call for help but instead left the apartment with Tucker. The court

47

found that the defendant showed little remorse for the offenses, reflecting that he had no hesitation about committing the crimes when the risk to human life was high.

## A. LENGTH OF SENTENCE

The defendant asserts that the trial court incorrectly applied enhancement and mitigating factors and imposed an excessive sentence. First, the defendant contends that the record does not support a finding that he was a leader in the commission of the crimes. We disagree. The proof shows that the defendant planned with Tucker to steal the victim's car. The defendant agreed to leave the victim's apartment door open for Tucker but instructed Tucker to give him approximately thirty minutes before entering the apartment. The defendant also told police that he and Tucker agreed that the defendant would pretend to be a victim of the crimes. Once inside the apartment, the defendant acted according to the plan. We believe that this evidence supports the application of enhancement factor (2).

As for enhancement factor (5), the defendant argues that he did not treat or allow the victim to be treated with exceptional cruelty as evidenced by the defendant's testimony that he was taped and taken out of the bedroom before the rape occurred. The state responds that the jury largely rejected the defendant's testimony and that the factor is applicable because the proof showed by a preponderance of the evidence that either the defendant raped the victim or was criminally responsible for the act committed by Tucker. We agree. The victim testified that she heard the sound of a belt being removed immediately before she was raped. The defendant was wearing dress shorts, and Tucker was wearing jogging pants. This evidence leads to the logical conclusion that the defendant raped the victim. Even if Tucker raped the victim, the defendant allowed Tucker to do so and was criminally responsible given the fact that the defendant was pretending to be a victim. Under these circumstances, the trial court appropriately applied factor (5). See State v. Carter, 908 S.W.2d 410, 412-13 (Tenn.

Crim. App. 1995) (factor (5) applicable based upon commission of rape during especially aggravated kidnapping and aggravated robbery).

Relative to factor (15), the proof supports the application of the factor given the intimate relationship between the defendant and the victim and the fact that the victim considered the defendant to be her boyfriend. The defendant abused that position of trust.

As for the trial court's application of enhancement factor (6) to the attempted first degree murder, we hold that the evidence amply supports the trial court's finding that the personal injuries sustained by the victim were particularly great. Relative to enhancement factor (16), the state concedes that the trial court inappropriately applied the factor because the potential for bodily injury always exists in an attempted first degree murder. We agree that factor (16) should not have been applied to this offense.

Although it is not clear whether the trial court applied enhancement factor (1), we hold that the factor should have been considered. Given the defendant's admission to the probation officer that he had prior convictions for trespassing and a motor vehicle charge, and given his admission that he had used illegal drugs, enhancement factor (1) is applicable, although not of great weight.

Regarding mitigating factors, the defendant argues that the trial court erred by refusing to apply in mitigation that the defendant acted under duress or domination of another person, see T.C.A. § 40-35-113(12), and that the defendant was remorseful, see T.C.A. § 40-35-113(13). In rejecting the defendant's claim of duress, the trial court found the defendant's testimony to be incredible. We are bound by that factual finding.

49

Relative to the defendant's remorsefulness, the trial court found that the defendant showed little remorse. Although the defendant made a statement apologizing for what had happened to the victim, the defendant refused to accept responsibility for the crimes, alleging that he had been wrongly convicted. The trial court was able to observe the defendant's demeanor and to evaluate his testimony for the purpose of determining the sincerity of the defendant's expression of remorse. The record does not preponderate against the trial court's findings.

In consideration of the record before us, we hold that the trial court appropriately sentenced the defendant to twenty-five years for the especially aggravated robbery conviction. Although, as conceded by the state, the trial court erroneously applied enhancement factor (16) to the attempted first degree murder conviction, enhancement factor (1) should have been applied. We do not believe that the defendant is entitled to a reduction in the sentence imposed by the trial court. We conclude that a twenty-year sentence is warranted under the circumstances of this case.

## B. CONSECUTIVE SENTENCING

The defendant challenges the imposition of consecutive sentences. He asserts that the trial court inappropriately relied upon the defendant's prior criminal history in determining the defendant to be a dangerous offender. The state responds that the trial court did not consider the defendant's criminal history in its decision that the defendant was a dangerous offender. We agree. The defendant also argues and the state concedes that the trial court failed to make the necessary findings under State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995). The state argues that consecutive sentences are nonetheless supported by the record in this case.

Consecutive sentencing may be ordered if the trial court finds by a preponderance of the evidence that the defendant is "a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." T.C.A. § 40-35-115(b)(4). However, a finding that the defendant is a dangerous offender will not, standing alone, justify consecutive sentencing. Wilkerson, 905 S.W.2d at 939. In addition to a finding that the defendant is a dangerous offender, consecutive sentencing requires further findings that an extended sentence is necessary to protect the public against the defendant's future criminal conduct and that the sentences will reasonably relate to the severity of the offenses committed. Id.

We note that the defendant was sentenced before our supreme court rendered its decision in Wilkerson. However, even then Tennessee law required trial courts to make the additional findings that consecutive sentences reasonably related to the severity of the offenses and were necessary to protect the public. See State v. Woods, 814 S.W.2d 378, 380 (Tenn. Crim. App. 1991); see also State v. Desirey, 909 S.W.2d 20, 33-34 (Tenn. Crim. App. 1995). These findings were not made in this case. Without such findings, we cannot say from our de novo review of the record that they exist in this case by a preponderance of the evidence. In any event, given our conclusion that the attempted first degree murder conviction must be reversed and the case remanded for a new trial, consecutive sentencing based upon appropriate evidence and findings under Wilkerson may be imposed should the defendant be convicted again.

## X. DUE PROCESS VIOLATION UNDER ANTHONY

The defendant asserts that his due process rights were violated by convictions for both especially aggravated robbery and attempted first degree murder. He argues that only one of the convictions can stand under State v. Anthony, 817

S.W.2d 299 (Tenn. 1991), because the offenses arose out of the same incident and the same act, the slashing of the victim's throat, was used to establish both offenses. He argues that although he did not raise the issue in his motion for new trial, the error constitutes plain error. We disagree.

The teachings of Anthony have no application in this case. In Anthony, our supreme court held that due process under our state constitution prohibited convictions for both kidnapping and another felony when the kidnapping was essentially incidental to the accompanying felony. 817 S.W.2d at 306-07. Contrary to the singular relationship of our kidnapping statutes to various crimes of violence, a murder attempt is not always shown by proving an especially aggravated robbery. See State v. Oller, 851 S.W.2d 841, 842-43 (Tenn. Crim. App. 1992) (proving the elements of especially aggravated burglary, especially aggravated robbery and first degree murder do not inherently or necessarily prove the elements of either of the two other offenses). Neither is incidental to the other. Thus, the need for a due process analysis under Anthony does not even arise.

In consideration of the foregoing and the record as a whole, we affirm the especially aggravated robbery judgment of conviction. We reverse the attempted first degree murder conviction and remand the case for a new trial.

_____
Joseph M. Tipton, Judge

CONCUR:

_____
Gary R. Wade, Presiding Judge

_____
Curwood Witt, Judge